*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* THOMPSON, Minors.

UNPUBLISHED
October 27, 2022

Nos. 360788; 361058
Lenawee Circuit Court
Family Division
LC No. 19-000363-NA

Before: RONAYNE KRAUSE, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-mother and respondent-father appeal as of right the trial court order terminating their parental rights to twins, MT and ET, under MCL 712A.19b(3)(c)(*i*), (g), (i), and (j). For the reasons set forth in this opinion, we affirm.

## I. BASIC FACTS

Respondents have four children together: MT and ET, the twins at issue in this appeal, and two older children, KT and IT. In early 2018, Children's Protective Services (CPS) investigated respondents after KT, then only a few months old, was diagnosed with a fractured skull, a subdural hematoma, a swollen tongue, and a healing rib fracture. During the CPS investigation that followed, respondents admitted that they were the only caregivers at the time KT incurred these injuries. In a prior proceeding, testimony indicated that KT's injuries could not have occurred by accident. In October 2018, the court terminated respondents' parental rights to KT.

After respondent-mother gave birth to IT in 2019, respondents refused to cooperate in a CPS investigation that followed. Consequently, petitioner filed a petition requesting that the court take jurisdiction of IT. In June 2020, however, the petition was abandoned after IT was placed in a guardianship with his maternal grandparents.

---

[1] *In re Thompson Minors,* unpublished order of the Court of Appeals, entered April 20, 2022 (Docket Nos. 360788, 361058).

Shortly after IT was placed in the guardianship, respondent-mother gave birth to MT and ET. At the time, respondent-mother and the twins all tested positive for THC. In July 2020, petitioner filed a petition requesting that the court take jurisdiction of the twin infants. The petition referenced, in detail, the events that culminated in the termination of respondents' parental rights to KT and the creation of IT's guardianship. Respondents pleaded no contest to the allegations in the petition and, thereafter, they were ordered to comply with a treatment plan designed to address the barriers to reunification. When respondents failed to make sufficient progress, petitioner filed a petition seeking termination of respondents' parental rights. At the conclusion of a hearing in February 2022, the trial court terminated respondents' parental rights to the twins. Both respondents now appeal.

## II. DISCUSSION OF THE ISSUES

### A. REASONABLE EFFORTS

For her first issue on appeal, respondent-mother asserts that the trial court erred when it found that reasonable efforts were made to reunify the family. In particular, she argues that petitioner failed to make reasonable efforts to assist with transportation to and from parenting time. We disagree. A review of the record confirms that, under the circumstances in this case, petitioner's efforts were reasonable and designed to remove the barriers to reunification.

Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010), citing MCL 712A.19a(2). Absent aggravating circumstances, the Department of Health and Human Services (DHHS) "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017). "As part of these reasonable efforts, the [DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Id*. at 85-86. "The adequacy of the [DHHS's] efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood,* 483 Mich 73, 89; 763 NW2d 587 (2009). This Court generally reviews a trial court's finding that "reasonable efforts were made to preserve and reunify the family" for clear error. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005).

Contrary to respondent-mother's assertions, DHHS made reasonable efforts toward reunification under the circumstances presented. The children were initially placed in the home of the maternal grandmother in Lenawee County. However, after approximately three months, the maternal grandmother, who was also the guardian of respondents' son, IT, requested that the infants be removed. The twins were then placed in a licensed foster home for approximately one month, but respondents expressed a desire for placement with relatives. Consequently, the children were moved to the home of the paternal great-grandparents in Howard City, a three-hour distance from Adrian. Although their location was not ideal, these relatives were willing to care for the infants and it was the least restrictive, most family-like setting for the children. Moreover, the paternal great-grandparents were willing to provide permanency for the children and, in this placement, the children were able to have sibling visits with their oldest brother, KT, who was in an adoptive home nearby. Because respondent-mother voluntarily elected to reside in Adrian for much of this case, there was a three-hour distance between her and the children. Further, it appears

undisputed that respondent-mother did not have reliable transportation and that this was a barrier to attending visits. DHHS's efforts cannot be considered in a vacuum, but must be assessed based on the foregoing backdrop.

The caseworker testified that DHHS could not transport respondent-mother to Howard City three times a week. Moreover, it would have been unreasonable for DHHS to arrange for the transportation of two infants over a six-hour distance round trip. However, respondents were planning together and frequently attended parenting time together. Combining their resources made it possible for them to attend parenting time. The testimony confirmed that they were not always without a means of transportation. Respondent-mother testified that respondent-father, at one time, owned a truck and a motorcycle. Then, the paternal great-grandparents gave respondent-father $3,000 to purchase a vehicle. Further, respondent-mother admitted that she sometimes did have transportation. In addition, DHHS routinely provided respondents with financial assistance. The caseworker testified that respondent-mother was given in excess of $250 in gas cards to assist in transportation. Further, parenting time was moved around to accommodate respondents' work schedules. Also, in an effort to alleviate some of the burden, parenting time was changed in July 2021 from one hour, three days a week, to 1½ hours, two days a week, with one of the days falling on the weekend. This accommodation allowed for fewer trips while maintaining the same number of hours. Considering the foregoing, the record does not support the suggestion that respondent-mother was completely without transportation resources or that DHHS failed to make reasonable efforts to assist her in this regard.

Moreover, respondent-mother's contribution to the transportation challenges should not be ignored. The transportation issue could have been fully or partially mitigated if respondent-mother was willing to reside closer to the children. Indeed, the record suggests that such a move was attractive on several levels. Employment opportunities existed near the children's foster home. Respondent-mother testified that her longest length of employment was when she was employed as a certified nurse assistant in Greenville, a community in the same county and much closer to the children than Adrian. Further, DHHS attempted to assist respondent-mother in securing housing when she expressed a willingness to relocate closer to the children. Ultimately, however, respondent-mother elected to live in Adrian, a three-hour distance from her children. Her rationale included that she would be closer to her family support system, and closer to her son, IT. Respondent-mother's priorities, while understandable, were shortsighted considering that her parental rights to IT were intact, whereas her rights to ET and MT were in jeopardy.

Further, the lack of transportation was not the only reason respondents missed parenting time. The caseworker testified that even when they had reliable transportation, respondents missed visits with the children. Testimony indicated that 25% of the visits were missed for reasons other than a lack of transportation.

Finally, respondent-mother has failed to identify what services DHHS should have provided that would have yielded a different outcome. *In re Fried,* 266 Mich App at 543. Even if additional services or modifications had been pursued, it is unlikely the results would have been any different. Although the court considered respondents' failure to attend parenting time, this was not its primary concern. The court noted that the children came into care chiefly because respondents' parental rights to another child were terminated because of severe physical abuse. Accordingly, the court found substantially more compelling respondents' failure to fully

participate in individual counseling and parenting education. Consequently, even if DHHS had provided additional services to assist respondent-mother in attending visits, it is unlikely that the results would have been different in light of respondent-mother's failure to demonstrate that she had addressed other issues directly related to whether ET and MT would be safe in her care.

The trial court did not clearly err when it found that reasonable efforts were made toward reunification. Respondent-mother was either unwilling or unable to take advantage of and benefit from the services offered. Although DHHS "has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).

## B. STATUTORY GROUNDS

Both respondents argue that the trial court erred when it found statutory grounds to terminate their parental rights. We find no error in this regard.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo,* 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller,* 433 Mich 331, 337; 445 NW2d 161 (1989).

The court terminated respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (g), (i) and (j), which provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.
>
> * * *

(i)  Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights.

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err when it terminated respondents' parental rights under these grounds.

The evidence established that in July 2020, the two children at issue in this appeal were removed from respondents' care because of the prior involuntary termination of their parental rights, their failure to cooperate with an earlier CPS investigation, and the fact that respondent-mother and the newborns all tested positive for THC at the time of the twins' birth. Respondents then pleaded no contest to the allegations in the petition and the court ordered respondents to comply with a treatment plan designed to improve their parenting skills and insure that the children would not be at risk of harm in their care. Respondents were referred for parenting classes and individual counseling. They were offered housing assistance, parenting time, and foster care case management. Despite these referrals, respondents never fully participated in, or showed that they benefited from, the treatment plan.

In light of the prior termination of parental rights, the court's primary concern was whether the children would be at risk of harm in respondents' care. The court concluded that the most important facet of the treatment plan was participation in parenting classes and individual counseling. Services of this nature would be designed to identify the cause of the earlier events and remedy conditions so that history would not repeat itself. Respondents, however, failed to take advantage of these services. Both respondents were referred for therapy, but neither engaged until the eve of the termination hearing. At the time of termination, respondent-mother had participated in only four hours of therapy. Respondent-father claimed to have been treating with a therapist, but when the caseworker called the provider to verify participation, staff indicated that it had been more than six months since respondent-father had attended therapy. At the time of termination, respondents' emotional and mental stability remained barriers to reunification.

Because respondent-mother and the children tested positive for THC, a substance abuse assessment was included as a component of her treatment plan. Respondent-mother completed part of her assessment by January 2021, but she never completed the second part of the assessment, which could have simply been completed online. Consequently, at the time of termination, there was no evidence that respondent-mother had addressed any substance abuse issues.

Early on, respondents participated in several online parenting classes, but the caseworkers questioned whether they benefited from the services. The evidence established that respondents did not consistently attend parenting time and, when they did, they failed to fully engage with the children. They did not consistently bring supplies for the children and they spent a fair amount of time on their cell phones. They also appeared to either not recognize or be dismissive of safety concerns. The court found this particularly alarming considering that either or both respondents had physically abused or failed to protect their oldest child from severe injury. The caseworker

recognized that respondents had participated in several online parenting classes, but concluded that respondents might benefit more from a parenting class, whether in-person or online, that allowed for interaction with an actual instructor. A referral was made for parenting classes of this nature, but respondents never complied with this referral.

The evidence demonstrated that respondents did not meaningfully participate in the most important services designed to address the primary barriers to reunification. To the extent that respondents did participate, they did not benefit therefrom. Respondents did not gain any insight into the circumstances that caused their family to be under court and CPS scrutiny for nearly four years. Indeed, during the instant proceedings, respondents continued to deny any knowledge of how KT's injuries occurred or take any responsibility for his injuries. As a consequence, concern for ET and MT's safety should they be returned to respondents' care was warranted.

Not only did respondents fail to meaningfully address their emotional stability and poor parenting skills, they were also unable to maintain a stable home environment. During the 19 months that ET and MT were court wards, respondents were unable to obtain and maintain suitable housing. At the time of termination, respondent-mother was sleeping on the couch of her aunt's cluttered and unkempt home. She was waiting for the court presiding over the guardianship to approve her living with her parents and IT in Adrian.[2] For most of the case, respondent-father was either homeless or staying with friends. At the time of termination, he was living with his pregnant girlfriend and it was unclear whether he had rights under a lease or if it was suitable for his children. DHHS attempted to assist respondents in achieving housing stability, but its efforts were frustrated by several factors. On more than one occasion, the caseworker explained to respondents that housing options were limited because respondent-father's criminal history frequently made him ineligible for certain housing programs. It was possible that respondent-mother could have more housing options if she was not planning with respondent-father. Throughout the case, however, the nature of respondents' relationship was unclear. There was conflicting evidence regarding whether respondents were still in a relationship and whether they intended to plan together. Further, respondent-mother's frequent moves between multiple counties made it difficult for DHHS to effectively utilize housing resources.

In sum, the children were removed from respondents' care primarily because of the prior termination of their parental rights and the fact that respondent-mother and the newborns tested positive for THC at the time of the births. Respondents were provided with treatment plans designed to rectify the conditions that led to the prior termination of their parental rights. During the entire 19 months that ET and MT were in care, respondents did not meaningfully participate in or benefit from services. They did not demonstrate that they could properly parent ET or MT or that these twins would be safe in their care. The conditions that led to the adjudication continued to exist. Further, the record supports the trial court's finding that there was no reasonable likelihood that respondents would be in a position to safely parent their children within a reasonable time. Respondents had been offered services for more than a year and they never

---

[2] It appears that as part of the guardianship, respondents had visitation rights with IT. Their visitation was suspended by the court when they failed to timely return IT to the guardian after a visit.

meaningfully engaged in the treatment plan. Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondents' parental rights under MCL 712A.19b(3)(c)(*i*) and (i). Likewise, the court did not err when it found clear and convincing evidence to terminate respondents' parental rights under MCL 712A.19(3)(g) and (j). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711.

## C. BEST INTERESTS

Lastly, both respondents challenge the trial court's finding that termination of their parental rights was in the children's best interests. After reviewing the record, we conclude that the trial court did not err in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). The court may consider several factors when deciding if termination of parental rights is in a child's best interests, including the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. *In re Olive/Metts Minors,* 297 Mich App 35, 42; 823 NW2d 144 (2012). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White,* 303 Mich App at 713. In considering the child's best interests, the trial court's focus must be on the child and not the parent. *In re Moss,* 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id.* at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones,* 286 Mich App at 129.

ET and MT were approximately 19 months old at the time the court terminated respondents' parental rights. Except for four months when they were in the care of their maternal grandmother, and briefly in a licensed foster home, the only home they had ever really known was that of their paternal great-grandfather and his wife. The children were doing well in this relative placement and all of their needs were being met.

The evidence demonstrated that both boys required additional services to ensure their age-appropriate development. Although, in general, the twins were healthy, there were some developmental concerns with one of the children. After an Early-On assessment, it was determined that ET was showing a 42% deficit in his fine motor skills. ET also demonstrated some speech delays—a 52% deficit. Early-On of Michigan created an Individualized Family Service Plan and the great-grandparents were ensuring that the children received the services that were required to foster their continued growth. Further, both boys required glasses and the great-grandparents were diligently addressing the challenges of keeping glasses on active toddlers.

Throughout the case, the paternal great-grandparents expressed an interest in adopting ET and MT should the court terminate parental rights. The great-grandparents were also facilitating a relationship between the boys and their extended relatives who lived both in the Howard City area and the Adrian area. By contrast to the care provided in the relative foster home, respondents had not demonstrated the consistency and stability necessary to meet their children's needs. When balancing the best-interest factors, a court may consider the advantages of a foster home over the parent's home and the possibility of adoption. *In re Olive/Metts,* 297 Mich App at 41-42.

The court also considered and found that some bond existed between respondents and the children. Respondent-mother testified that the children referred to them as "mom and dad," and that they were always excited to see them at a visit. However, the caregiver testified that she did not see a bond. According to the caregiver, any excitement the children exhibited was similar to the reaction when any new person came to the house. A foster care worker noted that the children had a very close attachment to the caregivers. When either ET or MT were hurt or frightened, they immediately ran to one of the great-grandparents. The foster care worker also noted that, during parenting time, when it was time for respondents to leave, the children showed no reaction. The court considered the existence of a bond, but did not clearly err by finding that any bond did not outweigh the children's need for a safe and stable home where their needs were being met.

Respondents argue that it was not necessary to terminate their parental rights because the children were placed with a relative. The trial court acknowledged that the twins' placement with a relative would favor reunification, but it went on to balance relative placement with other relevant factors. The court noted the children's young ages and their need for permanency, stability, and finality. It also found compelling that respondents never took advantage of the extra perks that are generally afforded parents when a child is placed with a family member. Ultimately, the court concluded that termination of respondents' parental rights was in the children's best interests. Even though placement with a relative weighs against termination, and the fact that a child is living with relatives must be considered, a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the court properly balanced relevant factors and it did not clearly err by finding that termination of parental rights was in the children's best interests despite the fact that they were placed with relatives.

In sum, a preponderance of the evidence supports that respondents had not attained the stability and parenting skills necessary to parent two toddlers. By contrast, ET and MT were thriving in a stable home where their needs were being met. Termination was the best avenue for the children to achieve stability, permanence, and finality. Accordingly, the trial court did not clearly err when it found that termination of respondents' parental rights was in the children's best interests.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Kathleen Jansen
/s/ Christopher M. Murray